# EXHIBIT B

## BEFORE THE HEARING BOARD
## OF THE
## ILLINOIS ATTORNEY REGISTRATION
## AND
## DISCIPLINARY COMMISSION

In the Matter of:

**JOHN L. MALEVITIS,**

    Attorney-Respondent,

    No. 6184398.

Commission No. 2010PR00107

## REPORT AND RECOMMENDATION OF THE HEARING BOARD

### INTRODUCTION

The hearing in this matter was held on August 22, 2011, at the Chicago, Illinois offices of

the Attorney Registration and Disciplinary Commission (ARDC), before a Hearing Board Panel

consisting of Terrence M. Burns, Chair, Rebecca J. McDade, and William E. Gabbard.  The

Administrator was represented by Gina M. Abbatemarco.  Respondent appeared in person and

was represented by Samuel J. Manella.

### PLEADINGS

On August 18, 2010, the Administrator filed a two-count Complaint against Respondent

pursuant to Illinois Supreme Court Rule 753(b) charging him with misconduct related to his

handling of two separate matters.  Count I charges Respondent with collecting an unreasonable

fee, failing to reduce a contingent fee agreement to writing, overreaching, and undue influence in

the Kimberly Bird matter.  Count II charges Respondent with failing to deliver funds to a third

person, making false statements to a tribunal, engaging in dishonesty, fraud, deceit or

misrepresentation, and conduct prejudicial to the administration of justice in the Gary Potts

**FILED**

APR 1 2 2012

ATTY REG & DISC COMM
CHICAGO

matter.   Respondent filed an Answer in which he admitted many of the factual allegations, denied some of the factual allegations, and denied all of the charges of misconduct.

## THE EVIDENCE

The Administrator presented the testimony of Edwin Miller, Kimberly Bird, Gary Potts, William K. Vasilius, Robert J. Hauser, Daniel J. Hayes, and Respondent as an adverse witness. Respondent testified on his own behalf and presented the testimony of Timothy Fundarek, John Demos, and Jeff Segal.  Administrator's Exhibits 1 through 36 and 38 through 41 were admitted into evidence.

Background

Respondent is 56 years old.  He has two daughters, ages 18 and 15, and is currently in the process of divorce.  His younger daughter is in high school and the older daughter attends college.  He continues to provide for them both.  (Tr. 242-43).

Respondent received his undergraduate degree from the University of Illinois Chicago and his law degree from John Marshall Law School.  He was admitted to the Illinois bar in 1983. From 1982 through 1988, Respondent worked in various divisions of the Cook County State's Attorney's Office.  He then spent four years at the law firm of Johnson, Cusak & Bell, where he concentrated his practice on products liability defense matters.  He did plaintiff's work at a small firm for a brief period before becoming a sole practitioner in 1995.  He concentrates his practice primarily on plaintiff's personal injury matters. Respondent has also been admitted to practice in Michigan and maintains an active license in that state.  (Tr. 211-15, 244-45).

Count I

Kimberly Bird

Kimberly Bird worked as an assistant at the Edwin Miller Insurance Agency from 2000 to 2008. Her job responsibilities included answering telephones, processing business, and providing customer service. She was not involved in negotiating with insurance companies or in making claims. (Tr. 50).

In 2006, Ms. Bird was injured in an automobile accident when she was rear-ended by another vehicle and pushed into oncoming traffic. She suffered a broken arm, which required her to wear a cast for six weeks, and undergo physical therapy. Her injury also caused her to miss work. Ms. Bird initially tried to negotiate a settlement of her claim with the insurance company on her own. She later asked her boss, Mr. Miller, to help her because he was more experienced in these matters. At the time Respondent became involved in the case, they had already obtained a written settlement offer from the insurance company for a little more than $20,000.00. (Tr. 50-53).

The first time Ms. Bird remembers meeting Respondent was at a White Sox game she attended with Mr. Miller. She knew who he was and may have seen him around the office previously. Ms. Bird does not recall the exact date of the game. She initially testified she thought it was in July or August of 2007. She later testified it was somewhere around the spring of 2007. (Tr. 53, 65-68).

While at the game, Ms. Bird and Mr. Miller had a discussion with Respondent about her car accident. She does not recall how the subject came up. They discussed what had happened in the accident, the injury to her arm, and her physical therapy. Mr. Miller did most of the talking. They also discussed what had been offered by the insurance company to settle the

3

matter. Ms. Bird believes they mentioned the $20,000.00 amount. Respondent told Ms. Bird he could get her more money. He also stated because of the medical bills and lost wages, he could probably get her "double." Respondent said he would make a couple of phone calls. After the White Sox game, Ms. Bird did not continue to negotiate with the insurance company on her own. (Tr. 54-55).

On May 30, 2007, Ms. Bird faxed various materials to Respondent regarding her accident. She considered Respondent to be representing at the time. The fax cover sheet refers to 11 pages of attachments. Included in the materials that followed was a copy of a settlement offer Ms. Bird received from Safeco in the amount of $19,091.00. Ms. Bird did not specifically recall what was included in the 11 pages, but believes the settlement offer was part of what she sent. She noted the date stamp of "05/30/2007" in the top left hand corner of the offer, which coincided with the date of the fax. (Tr. 67-68, 80-84; Adm. Ex. 3 at 18 & 24).

Ms. Bird received another written offer from Safeco for $20,123.00 in a letter dated June 8, 2007. She conceded the date of this offer was after the date of the fax. She did not recall whether she sent Respondent a copy of this letter. When asked whether she ever told him about it, she testified she is "sure it came up." She did not recall the details of any specific conversation she had with Respondent about this offer. When asked again if she was "sure" she told him about it, Ms. Bird testified she did not remember. (Tr. 66-68, 71; Adm. Ex. 1).

Ms. Bird testified she obtained her own medical records and sent them to Respondent. She also sent him copies of her medical bills and records documenting her lost time. She did not recall ever meeting with Respondent while he was representing her and did not know if he was working on her case. Although she spoke with him on the telephone when they were receiving settlement offers, she did not receive any correspondence from him. (Tr. 56, 69, 71-72).

4

In July 2008, about a year after they attended the White Sox game, Ms. Bird agreed to accept a $27,000.00 settlement offer that had been obtained by Respondent. Respondent advised her at the time she could file a lawsuit and perhaps get more money, but she did not want to pursue the matter in court. Respondent also told her he did not feel they would get "much more" by going to court. (Tr. 57, 69-70).

Ms. Bird did not receive a written contingent fee agreement from Respondent until he faxed it to her around the time of the settlement. She did not sign the agreement or return it to him because she had not agreed to any of its terms. When they spoke at the White Sox game, they had only discussed Respondent making a couple of telephone calls to help her out; there was no agreement made and no talk of contracts or fees. Respondent later contacted her and asked her to fax the agreement back to him, but she told him she was not going to sign it because they had not talked about "any of this." (Tr. 57-61; Adm. Ex. 3 at 55).

Ms. Bird did not have any further contact with Respondent until he called to let her know the settlement check had arrived. On September 30, 2008, she went to Respondent's office and met with him in a conference room to sign the settlement check and view the settlement statement. The original settlement statement showed Respondent's attorney's fees as "40% per contingency agreement," for a total fee of $10,800.00. After deducting the amount of the medical lien, Ms. Bird was to receive $13,200. (Tr. 62; Adm. Ex. 2).

After she reviewed the statement, Ms. Bird told Respondent she did not agree with his fee and did not feel it was fair. She also mentioned they had not talked about it. Respondent then agreed to reduce his fee from $10,800.00 to $10,000.00. Ms. Bird still was not happy with the fee and they discussed the matter a little further. Ms. Bird did not recall exactly what Respondent said, but he used some "legal verbiage" in trying to explain it. At this point, Ms.

Bird did not continue to dispute the fee. Respondent was in a hurry to get somewhere, so she signed the settlement statement and left. Ms. Bird was not in Respondent's office very long. Ms. Bird does not recall taking the check home with her after meeting with Respondent and believes this was the only time she was in Respondent's office during the case. (Tr. 63, 73-74, 79-80).

Ms. Bird testified, although she signed the settlement statement, she did not want to sign it and she told Respondent this. She signed it because she did not feel she "had any other choice," and because it was the "only way" she was going to get the settlement check. She testified so much time had passed already and she felt this was the "only option" she had. Ms. Bird testified she did not need the money from the settlement at the time. (Tr. 63-64, 74-75).

After she signed the settlement statement, Ms. Bird told Mr. Miller she thought Respondent's fee was unfair and unreasonable. She asked Mr. Miller to talk to Respondent about it, but he did not indicate to her whether he would. (Tr. 64-65).

Ms. Bird testified Respondent did not discuss charging a contingent fee when they first met and never told her he would be charging a contingent fee. She believes Respondent changed the terms they originally discussed at the White Sox game, when he indicated he would help her out by making a few telephone calls. Although she did not know Respondent prior to this, she assumed he agreed to help her based on his friendship with Mr. Miller. Ms. Bird denied discussing Respondent's fee with Mr. Miller prior to the settlement. (Tr. 64, 72-73).

Ms. Bird still believes Respondent owes her money because the fee he charged was "very unfair" in light of the fact they did not have a contract. She admitted she made a $25,000.00 demand in response to a recent offer by Respondent to pay her $2,500.00. Ms. Bird explained

she would be happy with $10,000.00, but figured she would be "negotiated down" and "needed to start somewhere." (Tr. 78-79).

Ms. Bird no longer works for Mr. Miller and no longer has any contact with him. She left his employ because she wanted to be an agent on her own and also because she had some personal issues with him regarding a returned check. The check was dated three years earlier and by the time Mr. Miller attempted to cash it, the account was closed. Ms. Bird believes checks are only valid for six months and did not expect it would ever be cashed when she closed the account. (Tr. 75-77).

<u>Edwin Miller</u>

Edwin Miller is a self-employed financial advisor and insurance agent. He operates his own agency in Mokena, Illinois. Respondent represented him in a case many years ago and they later became friends. They share season tickets to Chicago White Sox games. (Tr. 25-26, 36).

Mr. Miller has known Ms. Bird for 10 to 11 years and she used to work for him. While she was employed by him, she was injured in an automobile accident, and he agreed to assist her in negotiating a settlement of her personal injury claim with the insurance company. Prior to his involvement, Ms. Bird tried to represent herself and was only offered around $4,000.00 to $5,000.00. Mr. Miller told her this was absurd and offered to call the insurer on her behalf. Mr. Miller then made several calls to the insurer and also supplied it with some payroll data. The insurer eventually came back with an offer of about $20,000.00. Mr. Miller told Ms. Bird he thought this was a fair offer. Mr. Miller did not recall the exact date he assisted Ms. Bird with this matter. (Tr. 26-27, 40-43).

Mr. Miller testified Respondent became involved in the case after he and Ms. Bird attended a White Sox game with him in the spring of 2007. Mr. Miller is not sure who brought

the subject up, but he recalls mentioning to Respondent Ms. Bird had been in an accident and had received a settlement offer. He also told Respondent he had been talking to the insurance company on her behalf. Mr. Miller remembers teasing Respondent and saying something like, "Hey, this attorney stuff is pretty easy. . . . I got $20,000.00 for Miss Bird from Safeco." Respondent told them they could do better. Mr. Miller does not recall Respondent's exact words or whether he said he could "double her offer," but remembered Respondent said he could get "a lot more money." Mr. Miller joked with Respondent about whether Ms. Bird would receive a "friends and family discount." Respondent declined to offer Ms. Bird a discount on his fee. (Tr. 27-31, 41).

Ms. Bird subsequently retained Respondent to represent her, but Mr. Miller was not privy to any of their discussions regarding fees. He recalled telling Ms. Bird most attorneys charge about one third, and she was fine with that. (Tr. 31, 34, 41).

Mr. Miller later learned a dispute had arisen between Ms. Bird and Respondent over his fee. Ms. Bird came to him and was very upset because she believed Respondent had taken more than they discussed. Mr. Miller did not recall whether she mentioned the amount of the fee, but believed she stated it was "almost half." He knew she was very upset she would be receiving less money than she was originally offered. Ms. Bird asked for his assistance, but he refused to get involved and recommended she talk to Respondent. Mr. Miller never discussed the matter with Respondent, and Ms. Bird has not said anything more to him about not being happy with Respondent's fee. (Tr. 31, 33-34, 42-43).

Mr. Miller recalled introducing Respondent to Ms. Bird prior to the White Sox game when Respondent was in the office on other occasions. He knew they had discussions on several of these occasions, but did not know what they spoke about. (Tr. 36-40).

8

Respondent

Although Respondent admitted attending a White Sox game with Mr. Miller and Ms. Bird in the spring of 2007, he testified he was already representing Ms. Bird in her personal injury case at the time. Respondent said he met Ms. Bird several times when he visited Mr. Miller at his office and agreed to represent her during one of these visits. This came about after Mr. Miller told Respondent Ms. Bird had been trying, unsuccessfully, to represent herself in the matter. Mr. Miller told him he had tried to help her, but had also been unsuccessful. Mr. Miller then advised Ms. Bird she needed an attorney and recommended Respondent. (Tr. 215, 220, 246-47).

Respondent testified he was retained by Ms. Bird approximately 30 to 45 days before he received her May 30, 2007 fax. He said they discussed his compensation at the time and he told her his fee would be in the range of one third to 40 percent, depending upon the case. He said Ms. Bird showed no hesitation and was in total agreement with this fee. Respondent testified his standard contingent fee agreement in personal injury cases where he does not have to file litigation is in the range of 33 1/3 to 40 percent, depending upon the complexity of the case and other factors. (Tr. 224, 247-48).

Respondent denied ever being told by either Ms. Bird or Mr. Miller a settlement offer had been received in her case; he also denied having knowledge of any specific offer. Respondent testified he was only made aware prior to the White Sox game of some numbers being "thrown around," including a very low amount of $5,000.00. Although he admitted he knew Mr. Miller had been trying to help Ms. Bird, he denied Mr. Miller ever discussed with him any specific settlement offer. Respondent believed Mr. Miller was wrong when he testified he communicated this information to Respondent. (Tr. 216, 219-21, 291-92).

Respondent denied he ever "got anything in writing" concerning any settlement offers by the insurer. Respondent specifically denied receiving a copy of the insurer's $19,091 offer. After Administrator's counsel pointed out this document was in his own file, Respondent testified he did not remember it being part of his file. Respondent also denied Ms. Bird ever gave him a copy of the June 8, 2007 letter containing the $20,123.00 offer. Respondent admitted his initial letter to the insurer is dated June 21, 2007, which is after the date of this second offer. (Tr. 216-19, 252, 284-86; Adm. Ex. 1, Adm. Ex. 3 at 24, 61).

Respondent described Ms. Bird's case as a "fairly direct . . . . simple broken arm case." He testified during the time he represented her, he visited her in person, talked to her numerous times on the telephone, exchanged faxes with her, and constantly reported to her on the case. He also obtained a letter from Mr. Miller detailing Ms. Bird's wages and submitted it to the adjuster in support of her lost wage claim. Respondent said he had many telephone conferences with the adjuster regarding the value of the case and referred him to verdicts from the Cook County Jury Verdict Reporter. (Tr. 248-52).

Although Respondent admitted Ms. Bird provided him with some of her own medical records, he believed he also obtained some records himself. Respondent acknowledged he did not have a signed medical authorization from Ms. Bird. He testified he sent out a HIPAA authorization along with his retainer agreement, but never received them back from Ms. Bird. He admitted there is no cover letter or other documentation in his file to support his claim. Respondent maintained he was able to get the physical therapy records without the signed consent by verifying he was Ms. Bird's attorney. Respondent could not identify any specific medical records in his file that he had obtained on Ms. Bird's behalf. (Tr. 221-23, 251, 286-87).

Respondent admitted he did not have a signed contingent fee agreement with Ms. Bird. He also admitted he sent her a contingent fee agreement to sign just prior to the settlement, which she did not return. Respondent did not advise Ms. Bird to seek the advice of another attorney when he sent her the written fee agreement. Respondent testified while they did not have a written agreement, he was proceeding on the basis of their verbal agreement. (Tr. 223-24; Adm. Ex. 3 at 64).

Prior to settling Ms. Bird's case, Respondent discussed the possibility of filing a lawsuit with her. Respondent testified he advised Ms. Bird the case might be worth pursuing, but Ms. Bird did not want to file suit and told him to accept the $27,000.00 offer. (Tr. 254-56).

When Respondent received the settlement check, he asked Ms. Bird come to his office to sign it, so it could be deposited into his client trust account. He told her they would handle the distribution later, after the check cleared. Ms. Bird agreed, but wanted to take the check with her and sign it outside of his office. Respondent thought this was unusual, but let her take the check. Respondent said over the course of the next few weeks, Ms. Bird would not return his calls. When he finally reached her, she agreed to come into the office and bring the check. (Tr. 256-58).

Respondent met alone with Ms. Bird in a conference room at his office and they went over the settlement statement. Respondent denied Ms. Bird ever expressed any dissatisfaction or disagreement with his fee. He said after she saw the amount she would be receiving, she asked him if he could "do anything to the numbers" to "take some off." He also testified she asked him if he could do anything "to give her a little bit more money." Respondent said he agreed to waive some of his costs and fees in order to make her "feel better" and to make her "happy."

Ms. Bird then signed the settlement statement and received her check.  Respondent did not hear anything further about the case until the ARDC matter.  (Tr. 224-27, 258-59).

Respondent testified Ms. Bird was satisfied when she signed the settlement statement and never told him she needed time to discuss the matter with another attorney.  Respondent testified he had "no clue" she had any problem with his representation or his fees.  Respondent did not advise Ms. Bird to seek independent counsel when she signed the settlement statement because that "issue never came up."  (Tr. 227-28, 260).

Count II

Gary Potts

Gary Potts is 47 years old.  He is married to Barbara, who currently works at the K & L Gates law firm.  Mr. Potts has a high school degree.  Although he is not currently employed, he previously worked as a mechanic for 25 years.  (Tr. 85-87).

In May 2001, Mr. Potts was hit by a car while riding his bike to work.  He suffered various injuries, including a shattered wrist that required surgery.  Several days after the accident, Mr. Potts hired attorney Robert Hauser to represent him.  Mr. Hauser handled the case until November 2002, when Mr. Potts hired Respondent.  (Tr. 87-89; Adm. Ex. 7).

Mr. Potts met Respondent while he was working on Respondent's car.  He told Respondent about his personal injury case, which was then pending in Lake County.  He mentioned the judge had remarked the case should have been filed in Cook County, because they award better there.  Mr. Potts and Respondent then discussed the possibility of Respondent handling the matter.  Mr. Potts was not sure if he could hire another lawyer.  Respondent told him it was perfectly normal and happens all of the time.  He also told Mr. Potts the issue of fees would be settled between Respondent and Mr. Hauser and Mr. Potts would not be involved in the

matter. Mr. Potts, along with his wife, met again with Respondent about a week later at their home. Mr. Potts again raised the issue of fees. Respondent told Mr. Potts he would pay "one lawyer one fee one time," and the lawyers would resolve the division of fees. Mr. Potts then agreed to hire Respondent. His fee arrangement with Respondent included a 33 1/3 percent fee if the case settled out of court and a 40 percent fee if there was a jury trial. (Tr. 90-94; Adm. Ex. 8).

On November 11, 2002, Mr. Potts sent Mr. Hauser a letter notifying him he was being terminated from representing him in the case. He received a response from Mr. Hauser that included a list of Mr. Hauser's expenses. Mr. Hauser stated he expected to be reimbursed for those expenses. Mr. Hauser stated that he was asserting an attorney's lien for one-third of the amount recovered, up to $60,000, based on the contingency contract and the work done. Mr. Hauser further advised Mr. Potts what he paid another attorney would not affect what was owed to his firm. (Tr. 89-90; Adm. Exs. 7, 9).

Mr. Potts gave Respondent a copy of this letter and told him these were the expenses that were supposed to be paid out of the settlement. They also discussed the attorney's fees Mr. Hauser was claiming. Respondent told Mr. Potts he did not have to worry about the fees because he and Mr. Hauser would work it out. Mr. Potts testified Mr. Hauser's fee was a concern for him when he switched attorneys because Mr. Hauser had done a lot of work and he wanted to make sure he got paid. (Tr. 94-96; Adm. Ex. 9).

After Respondent took over, Mr. Potts testified he did not see any work for the first two years. Mr. Potts eventually appeared at a proceeding before a retired judge in Chicago and was awarded $73,717.78. (Tr. 97-98, 107-109).

Mr. Potts was later provided with a release and a settlement statement to sign. Mr. Hauser's costs of $882.50 are listed on the settlement statement as "Prior attorney's expenses on file" and were deducted from Mr. Potts' portion of the proceeds. Respondent received a fee of $29,486.80, which was 40% of total amount. Mr. Potts received $37,184.67. Mr. Potts did not have any discussion with Respondent regarding Mr. Hauser's fees at the time of the settlement. (Tr. 97-99; Adm. Exs. 14, 18).

Mr. Potts never saw a copy of the original check issued by Allstate, which included Mr. Hauser as a payee; nor was he aware Respondent filed a motion to adjudicate Mr. Hauser's lien to zero or Allstate later issued a second check. (Tr. 100, 110; Adm. Ex. 26 at 2).

Mr. Potts first became aware Mr. Hauser had not been paid a couple of years ago, when he was sued by Mr. Hauser. After he was served with the complaint, he called Respondent immediately to let him know what had happened. Respondent responded by asking Mr. Potts for $5,000.00 to represent him in the matter. Mr. Potts was "stunned" and "very upset." He did not retain Respondent or further discuss the case with him because he was "too upset." (Tr. 101-103).

Mr. Potts subsequently hired Daniel Hayes to represent him in Mr. Hauser's suit. Mr. Hayes worked at the same law firm as his wife and agreed to represent Mr. Potts pro bono. That case has been ongoing for about three years and has not yet been resolved. A judgment for $16,820.83 was entered against Mr. Potts and in favor of Mr. Hauser. Mr. Potts also obtained a judgment against Respondent for the same amount on his third-party claim. Mr. Potts has not collected on the judgment from Respondent and he has not been pursued in court for the judgment that was entered against him. Mr. Potts testified Mr. Hauser's suit has caused him a lot of stress and aggravation. (Tr. 103-105, 112; Adm. Ex. 32 at 284, 305-306).

Mr. Potts did not know if Respondent has made any settlement offers in the matter. Mr. Potts is not receiving any of the money himself and is willing to accept whatever Mr. Hauser will accept to resolve the case. Several months ago, Respondent sent Mr. Potts a check for $882.00 for the expenses, which he gave to Mr. Hauser. (Tr. 112-14, 105).

<u>William Vasilius</u>

William Vasilius is 65 years old. He has been the office manager at the law firm of Noonan, Perillo, Polenzani, & Marks (Noonan firm) since 2005 and held the same position at its predecessor, Sullivan, Smith, Hauser, & Noonan (Sullivan firm), from 1985 until 2005. The Noonan firm is located at the same address as the Sullivan firm. Mr. Vasilius' responsibilities include opening all of the mail and performing various bookkeeping functions. (Tr. 115-19).

Mr. Hauser left the Sullivan firm in January of 2005 and moved his office about three doors south. After his departure, Mr. Vasilius put aside any mail received on Mr. Hauser's cases and notified him it was there. Mr. Hauser would then either pick up the mail or Mr. Vasilius would drop it off at his office. To the best of his knowledge, Mr. Vasilius has never seen the Notice of Motion or the Plaintiff's Motion to Reduce Lien that was filed by Respondent in December 2005 in the Potts case; nor did he receive a copy of the order entered by the court on December 15, 2005, granting the plaintiff's motion. If Mr. Vasilius had received these materials, he would have given them to Mr. Hauser or let Mr. Hauser know they were there to be picked up. (Tr. 118-21; Adm. Exs. 15, 16).

Mr. Vasilius was later contacted by Mr. Hauser and asked to provide several affidavits related to the Potts matter. In one of these affidavits, he confirmed the Noonan firm had never been reimbursed for its costs. Prior to providing this affidavit, Mr. Vasilius checked all of the firm's records for the relevant time period and verified the firm never received anything from

Respondent or his firm. The Noonan firm was ultimately reimbursed for its costs in March 2011. (Tr. 122-24; Adm. Exs. 30, 40).

Mr. Vasilius does not know if Mr. Hauser submitted a change of address form to the post office when he left the Sullivan firm and did not know if something sent to his office was lost in transit before it was received. Mr. Vasilius testified he has been handling mail in these offices for over 26 years and did not recall any specific instance of not receiving mail. He acknowledged people have called on occasion and told him checks were in the mail that he had not seen, but that has happened just two or three times during his 26 years. (Tr. 124-25).

<u>Robert J. Hauser</u>

Robert Hauser attended Harvard Law School and was admitted to the Illinois bar in 1970. He worked at a law firm for several years before taking a job as a part-time public defender in Lake County. At the same time, he also began working for the Sullivan firm. He worked both jobs until 1976, and then continued to work for the Sullivan firm until January 2005, when he left to become a sole practitioner. He currently has his own firm in Waukegan, Illinois, where he does personal injury litigation and some criminal work. (Tr. 141-44).

Mr. Hauser was retained to represent Mr. Potts in May 2001. He initially met with and interviewed Mr. Potts, obtained a statement from a witness, and visited the accident scene and took photographs. He also had some contact with Allstate, the driver's insurer. After determining there were liability issues that would require the case to be litigated, he prepared a complaint and filed suit. Around this same time, he also served an attorney's lien on Allstate. Mr. Hauser then conducted written discovery in the case, including interrogatories and requests to produce documents. He prepared Mr. Potts for his deposition and was present when it was conducted. He also took the deposition of the driver of the car and her daughter, who was in the

car at the time of the accident. Much of his work is reflected in his file, which consists of 457 pages of materials. (Tr. 145-49; Adm. Exs. 4, 5, 6; Adm. Ex. 41 at 121-22).

In November 2002, Mr. Hauser received a letter from Mr. Potts terminating him from the case. At the time, the matter was set for trial in early January and they had just attended a pre-trial settlement conference. Although Mr. Potts had not previously expressed any dissatisfaction, Mr. Hauser knew he was not happy with the judge's recommendation. Mr. Hauser sent Mr. Potts a letter indicating he would honor the request, but also noting he intended to assert a lien based on the work he had done. (Tr. 149-50; Adm. Ex. 9).

Mr. Hauser learned Mr. Potts had hired Respondent when he received a letter from Respondent. Mr. Hauser wrote to Respondent and included a copy of his previous letter to Mr. Potts in which he asserted a lien. He also suggested Respondent advise Mr. Potts he would be responsible for Mr. Hauser's fees as well as Respondent's. (Tr. 151-52; Adm. Ex. 41 at 1, 2).

Respondent did not immediately file an appearance in the case and Mr. Hauser did not hear anything further from him. Because he was still the attorney of record and was concerned about the January trial date, Mr. Hauser noticed a Motion for Status. At the December 17, 2002, hearing on that motion, Respondent represented to the court that he would be ready for trial and Mr. Hauser was allowed to withdraw. Mr. Hauser reminded Respondent of the January trial date and offered him a copy of his file. Respondent told him not to worry and he would be ready. Mr. Hauser later sent Respondent a copy of the file out of concern for Mr. Potts. Mr. Hauser later learned the case was voluntarily non-suited in Lake County and re-filed in Cook County. Mr. Hauser did not believe Respondent did anything wrong by non-suiting the case and re-filing it. (Tr. 151-54, 174; Adm. Ex. 10; Adm. Ex. 41 at 3-4).

In early 2007, Mr. Hauser began to wonder what was going on in the case because of the time that had passed.  He wrote to the Allstate adjuster, Kathy Snelton, and inquired about its status.  Ms. Snelton responded the case had been settled and sent him a copy of a settlement check, which named Mr. Hauser as one of the payees.  Mr. Hauser had never seen this check and Respondent had not informed him he received it.  On March 1, 2007, Mr. Hauser wrote to Respondent, told him what he had learned and asked Respondent to contact him immediately to discuss the matter.  He also noted he had never given anyone authority to sign his name to the check.  (Tr. 154-56; Adm. Exs. 22, 23, 24).

In his March 5, 2007, response, Respondent accused Mr. Hauser of making "several erroneous and outrageous claims."  Respondent stated Mr. Hauser's name was never on any settlement check negotiated by his office.  He stated a settlement draft was issued naming only Respondent's firm and Mr. Potts, after the court entered an order extinguishing Mr. Hauser's attorney's lien.  Respondent did not include copies of the court's order or his motion to reduce Mr. Hauser's lien in this response.  (Tr. 156-57; Adm. Ex. 25).

Around this same time, Mr. Hauser was contacted by Ms. Snelton, who had since ordered the complete file in the case.  Ms. Snelton sent Mr. Hauser copies of the court's order adjudicating the lien and the second settlement check.  Mr. Hauser had not previously received Respondent's motion to reduce the lien or the court's order.  At the time the motion was filed, Mr. Hauser had relocated his offices, but he continued to receive some mail at his former firm's address.  Mr. Vasilius, the office manager, either dropped his mail off or Mr. Hauser would pick it up.  Mr. Hauser still had many files that were kept at his former firm and was at that office regularly.  (Tr. 157-59; Adm. Ex. 26).

Mr. Hauser wrote to Respondent again on March 6, 2007 and March 16, 2007. In both letters, he stated he had not received notice of the motion to adjudicate his lien and asked Respondent to immediately provide him with copies of the notice, motion and any other relevant materials. (Adm. Exs. 27, 28).

Mr. Hauser eventually went to the courthouse and reviewed and copied the entire file in the Potts case. He initially filed a motion to vacate the court's order adjudicating his lien, but later withdrew it after concluding it would be difficult to prevail since the order was several years old. He decided instead to file a separate case against Mr. Potts in Lake County. He sued Mr. Potts rather than Respondent because his agreement was with Mr. Potts. He anticipated Mr. Potts would file a third-party claim against Respondent. Mr. Hauser filed the Lake County action against Mr. Potts on November 2, 2007 and Mr. Potts filed a third-party complaint against Respondent and his law firm shortly thereafter. (Tr. 160-61, 172, 175; Adm. Exs. 12, 33, 34, 35).

Mr. Hauser testified he did not appear at the December 15, 2005, hearing on Respondent's motion to reduce his lien because he never received notice. If he had received notice, he would have appeared because he had done a lot of work on the case. Mr. Hauser does not consider his representation of Mr. Potts to have been "brief." He represented him for about a year and a half, did all of the depositions and other discovery and made numerous court appearances. (Tr. 161-62).

Mr. Hauser hired an attorney to litigate his claim against Mr. Potts. Mr. Hauser reviewed his file in connection with that matter and created an itemized list of his work, which shows that he spent 58 hours on the case. Mr. Hauser ultimately obtained a judgment against Mr. Potts for

$16,820.83. Except for the costs that were paid in March 2011, Mr. Hauser has not received any of that judgment. (Tr. 162-64; Adm. Ex. 41 at 225-29).

Mr. Hauser testified neither he nor his former law firm received payment for the costs incurred in the Potts case prior to 2011. Mr. Hauser did not recall what Respondent said when he testified at the arbitration hearing about this matter, but remembered Respondent claimed at his deposition, he had paid the costs, either to Mr. Hauser or his former law firm. When Respondent was asked for proof of payment, he was not able to provide it. After reviewing certain portions of Respondent's deposition transcript, Mr. Hauser acknowledged Respondent testified it was his "recollection" and "belief" his firm had paid the costs. (Tr. 164-65, 169-71).

Mr. Hauser testified his judgment, with interest, now exceeds $20,000.00. Respondent recently made offers of $5,000.00 and $7,500.00 to settle the matter, but Mr. Hauser did not believe either amount is fair or adequate compensation, especially since he has learned Respondent relied on all of his work. Mr. Hauser has not pursued Mr. Potts for the judgment because he "wouldn't do that to Gary." (Tr. 166-68, 175-76).

Mr. Hauser acknowledged Respondent was involved in the Potts case for three years from the time he took the case over until it was resolved. He also admitted he did not have personal knowledge Respondent used his work. He knew a court order was entered, which allowed the parties to use the discovery from the Lake County case. He was also familiar with what Respondent did on the case because he reviewed Respondent's deposition testimony and had a discussion with the defense attorney. (Tr. 172-73).

Mr. Hauser testified he still believed he had a lien in the Potts case after he was discharged. He also acknowledged under Illinois law, you cannot assert a lien once you are

discharged, but must seek quantum meruit recovery, which is why he sued Mr. Potts based on a quantum meruit claim.  (Tr. 171-72).

Daniel J. Hayes

Daniel Hayes attended law school at the University of Notre Dame and was admitted to the Illinois bar in 1997.  He spent the majority of his legal career doing commercial litigation work at the law firm of Bell Boyd & Lloyd, which later merged with K & L Gates, LLP.  He was initially an associate at the firm and then became an income partner.  In June 2010, he left K & L Gates to take his current position as senior trial counsel at the Securities and Exchange Commission.  (Tr. 185-88).

Mr. Hayes became involved in the Potts case through Mr. Potts' wife, Barbara, who worked at his firm.  In November 2007, Barbara came to him and asked for his help with a fee dispute that had arisen in her husband's personal injury case.  Mr. Hayes subsequently agreed to represent Mr. Potts in the suit filed by Mr. Hauser on a pro bono basis.  When he left the firm, two of his colleagues agreed to handle the case.  (Tr. 188-89, 203; Adm. Ex. 33).

Mr. Hayes initially contacted Respondent in an effort to resolve the matter.  He had a telephone conversation with Respondent during which he explained his understanding of the facts of the case and law and expressed his opinion that Respondent should pay Mr. Hauser part of the fee.  He suggested Respondent call Mr. Hauser to work out an agreement.  Respondent refused to do so.  Respondent maintained Mr. Hauser was not entitled to anything and he absolutely refused to pay him.  He also suggested Mr. Hayes did not know the law and referred him to a case called Friedman v. Malevitis.  Mr. Hayes agreed to look at the case, but said he would have no choice other than to bring Respondent into the case as a third-party if they could

not work something out. Respondent then became angry and hostile and threatened to move for sanctions if Mr. Hayes went forward with the third-party claim. (Tr. 189-92).

Mr. Hayes later reviewed the case referenced by Respondent and concluded it involved a different fee issue and was inapplicable to the issues in the Potts matter. He then filed a third-party action on behalf of Mr. Potts against Respondent. Respondent continued to take the position he was not going to pay Mr. Hauser anything for his work in the Potts case. (Tr. 192-93; Adm. Exs. 34, 35).

During the fee litigation, Mr. Hayes attempted to obtain information from Respondent concerning whether Respondent had paid the costs incurred by Mr. Hauser's firm as reflected on the settlement statement. Mr. Hayes testified Respondent made oral representations to him that the costs had been paid and he "remembered" paying them. On September 23, 2008, and October 31, 2008, Mr. Hayes sent e-mails to Respondent requesting he provide documentation to support this claim. In response to the first e-mail, Respondent stated, "I remember paying it, and I have called the bank and also asked for my archive records to determine if the actual check is still in the file." In response to the second e-mail, Respondent stated, "My bank has to find it on microfishe (sic) because they told me it was too old. I remember sending out a check." Mr. Hayes stated Respondent also testified during his deposition and at the arbitration hearing that he had paid the costs and remembered paying them. (Tr. 193-99; Adm. Ex. 36).

Mr. Hayes also sent Respondent a document request asking for proof of payment in the form of cancelled checks or bank statements, but Respondent was never able to produce any such documentation. He also subpoenaed several of Respondent's banks seeking this information, but did not receive any documents in response. A representative of one of Respondent's banks told Mr. Hayes it could not find any documents or other information related to a payment by

Respondent to Mr. Hauser.    Mr. Hayes believed he discussed the bank's response with Respondent prior to the arbitration hearing, but he could not recall any specific conversation. (Tr. 194, 199-200; Adm. Ex. 38).

On December 12, 2008, at the conclusion of the arbitration hearing, Mr. Potts received an arbitration award in the amount of $16,820.83 plus costs against Respondent.    Mr. Hayes did not file anything seeking to reject that award and never told Respondent he intended to do so.    Mr. Hayes then had the award converted to a judgment on January 15, 2009 and began collection efforts.    Other than a few hundred dollars left over in one of Respondent's law firm accounts, he was not able to collect on the judgment.    (Tr. 200-202; Adm. Ex. 32 at 284; Adm. Ex. 39).

Mr. Hayes testified Respondent did not make any settlement offers during the litigation and took the position throughout he was not going to pay anything.    After the ARDC became involved, Respondent agreed to pay the costs listed on the settlement statement.    (Tr. 202-203).

<u>Respondent</u>

Respondent testified he agreed to take over the Potts case after Mr. Potts expressed dissatisfaction with Mr. Hauser because he filed the case in Lake County and was not keeping him informed or returning his calls.    Respondent advised Mr. Potts his case would do better in Cook County and Mr. Potts agreed to let him handle the matter.    (Tr. 228-29, 262-63).

Respondent admitted he received the Motion for Status Mr. Hauser had filed in the Potts case at the time of his withdrawal.    Mr. Hauser noted in that motion his work on the case included the following:    investigation of the accident and photographing the scene, telephone conferences and confirming correspondence to independent eyewitnesses, filing of lawsuit, drafting pleadings and amended pleadings, legal research, depositions of the parties and defendant's daughter, numerous conferences with the client and adverse attorney, and

participation in a pre-trial conference at which the judge recommended a $60,000.00 settlement

figure. Respondent also admitted receiving Mr. Hauser's December 27, 2002, letter, in which he

stated he was continuing to assert his one-third attorney's lien for the work he performed.

Respondent admitted Mr. Hauser also provided him with a copy of his file and he was permitted

by court order to use the discovery from the Lake County action. (Tr. 229-31; Adm. Exs. 10, 11,

13).

Although the Potts case was set for trial in Lake County when he received it, Respondent

denied it was "ready for trial." Respondent testified the medical had not yet been "worked up"

and there were issues regarding liability that had to be overcome. Respondent said he obtained

the testimony of Mr. Potts' doctor regarding pain and suffering, disfigurement, permanency and

medical expenses. He also obtained an affidavit from an eye witness to corroborate Mr. Potts'

version of the accident. (Tr. 230-31, 269-71, Adm. Ex. 32).

As the trial date in the case approached, the insurance company proposed they resolve the

matter through a binding arbitration rather than a jury trial. After discussing the proposal with

Mr. Potts, they agreed to this procedure. Respondent testified this required him to prepare for

and participate in a full-blown trial. The matter was heard by retired Judge Thomas Durkin, who

ultimately found Mr. Potts 50 percent responsible and reduced the award by about half.

Respondent believes this was a good result, because the case could have resulted in a not guilty

based on these facts. (Tr. 232, 271-73).

Respondent admitted he did not call Mr. Hauser to let him know the case had been

resolved or attempt to contact him to resolve his lien. Respondent testified he did not believe

Mr. Hauser had a lien under Illinois law following his termination. He also did not believe Mr.

Hauser's contingency agreement with Mr. Potts was valid and thought he would be required to seek recovery based on quantum meruit. (Tr. 232-34, 263-54, 287-88).

Respondent admitted the first check he received from Allstate was made payable to Mr. Hauser, as well as to Mr. Potts and Respondent. Respondent said he discussed this with Mr. Potts, who was anxious to get his money, and told him they needed to go to court and have a judge decide what Mr. Hauser was entitled to receive. Mr. Potts told him to go ahead and do what he had to do. In order to get the matter before the judge, Respondent prepared and filed what he titled Plaintiff's Motion to Reduce Lien. The motion requested the lien be reduced to "zero" and in support stated:

> 1. An attorney's lien was purportedly sent to the defendant's insurer, Allstate Insurance Company, by the law firm of Sullivan Smith Hauser & Noonan for its brief representation of the plaintiff herein.
>
> 2. Counsel herein has represented plaintiff from 2002 to the present, and recently litigated this case to disposition before the Honorable Thomas Durkin in a binding mediation, which resulted in an award for the plaintiff.
>
> 3. Counsel for the Plaintiff requests that this Court enter an Order reducing the lien to zero (0) so that plaintiff can be tendered his settlement funds without further delay.

Respondent testified he sought to adjudicate Mr. Hauser's lien to zero because he did not believe he had a one-third lien any longer and they would then "get into the area of quantum meruit." (Tr. 232-34, 292-93; Adm. Exs. 15, 19).

Respondent admitted he was aware when he filed his motion that Mr. Hauser had represented Mr. Potts for 17 months. Respondent testified he used the term "brief" because he considered Mr. Hauser's representation brief in relationship to the longer period of time he had spent on the case. Respondent never calculated the number of hours he spent on the case, but believes it was "a lot more than Mr. Hauser." (Tr. 235, 265, 299).

Respondent was given a hearing date on the motion for December 15, 2005. Respondent testified he immediately sent out the notice of the motion to Mr. Hauser. The certificate of service signed by Respondent stated the motion was mailed to Mr. Hauser at the Sullivan firm on December 7, 2005. (Tr. 265-66, 233-34; Adm. Ex. 15).

When Respondent appeared at the hearing on December 15, 2005, no one else stepped up when the case was called. Respondent testified he was "quite surprised" Mr. Hauser did not appear, since he knew he had been seeking to recover a one-third fee in the case. The judge passed the case over and later called it a second time. After no one appeared the second time, the judge entered the order granting the motion and extinguishing the lien. Respondent was not required to present any evidence. Respondent then sent a copy of the order to Allstate and the company issued a second check payable to Respondent and Mr. Potts. (Tr. 235, 266-67; Adm. Exs. 16, 17, 20, 21).

Respondent acknowledged he began receiving inquiries from Mr. Hauser about the Potts case in 2007. Mr. Hauser informed him he had not received the notice of his motion to reduce the lien and requested Respondent send him copies of these materials. Respondent admitted he did not send Mr. Hauser the motion or the order in response to these requests. Respondent testified he "had sent it out already" so he "didn't send it again"; nor did he call Mr. Hauser to try to work the matter out. (Tr. 237-38; Adm. Exs. 24, 25, 28).

Mr. Hauser later brought a motion to reconsider the judge's order extinguishing his lien, but withdrew it after it was fully briefed and set for hearing. Respondent thought this was the end of the matter. (Tr. 267-68).

Respondent admitted a judgment was entered against him on Mr. Potts' third-party claim after he failed to file a timely objection to the arbitration award previously issued in the matter.

Respondent testified Mr. Hayes indicated to him he was going to challenge the award on behalf of Mr. Potts. Respondent admitted he should not have relied on Mr. Hayes to file the rejection. (Tr. 242, 275-76, 298; Adm. Ex. 26; Adm. Ex. 32 at 284).

Respondent acknowledged he prepared a closing statement in the Potts case, which claimed Mr. Hauser's costs had been paid out of the settlement. He also admitted he repeatedly asserted during the litigation with Mr. Hauser and Mr. Potts his belief that the costs had been paid. Respondent stated it is his normal practice to pay the discharged attorney's costs at the time his firm is retained and he "assumed" that had been done here. Respondent denied ever telling anyone during the litigation he had definitely paid the costs. (Tr. 235-36, 240-41, 273-74; Adm. Ex. 18).

Respondent testified he believed for a long time the costs had been paid. He admitted he became aware at some point the bank could not find proof of any payment. He was not sure if he learned this before or after the arbitration. He admitted he searched his own records prior to the arbitration and could not find any record of a payment. Respondent is a sole practitioner and the only signatory on his firm's account. (Tr. 236-37, 241).

Additional Evidence Offered in Mitigation and Aggravation

Timothy Fundarek

Mr. Fundarek is 46 years old and has been a Chicago Police Officer for about 20 years. He met Respondent when they worked together many years ago and they have been friends for about 27 years. Mr. Fundarek knows others who know Respondent and was familiar with his reputation in the community for truth and veracity. He testified Respondent is an "excellent individual" and a truthful, caring, helpful and giving person. Mr. Fundarek was not really

familiar with the charges in the Complaint and did not know if the people he had spoken to about Respondent's reputation were are aware of the charges. (Tr. 132-35).

### John Demos

Mr. Demos is 54 years old and has been employed as a paralegal at the Law Office of Barbara M. Demos for 15 years. He has been friends with Respondent since they were in college together over 30 years ago. Mr. Demos' firm has also referred some traffic cases to Respondent. Mr. Demos knows others in the community who know Respondent and he has an "outstanding" reputation for truth and veracity. Mr. Demos was aware there are charges pending against Respondent that involve ethical violations. He did not know if anyone he has spoken to regarding Respondent was aware of the charges. (Tr. 137-39).

### Jeff Segall

Jeff Segall is 50 years old and is an attorney. He has his own law practice involving mostly personal injury and workers' compensation work. He has known Respondent both personally and professionally since the early 1990s. They met when they were on opposite sides of a case and later became friends. Mr. Segall has also been co-counsel with Respondent on about 12 cases. Mr. Segall did not really know judges, lawyers or others, who also know Respondent, but he stated Respondent's reputation with him is excellent. In the cases they have handled together, he has never heard any lawyer or judge say anything negative about Respondent. Mr. Segall was not aware of the charges in the disciplinary Complaint, but knew they involve alleged ethical violations. He did not know if the lawyers and judges involved in the cases he handled with Respondent were aware of these charges. (Tr. 178-83).

<u>Edwin Miller</u>

Mr. Miller testified he has remained friends with Respondent since he handled Ms. Bird's claim. He was familiar with Respondent's reputation in the community for truth and veracity and assumed it is "outstanding." (Tr. 47-48).

<u>Respondent</u>

Respondent admitted he failed to obtain a written fee agreement in the Bird matter, but stated he did not intentionally violate this rule. He testified the agreement was sent, but he did not realize it had not been returned. He also admitted if he had known that there was an offer of $20,123.00 on the table when he took on the case, he would have made some "adjustments" because it would have been "the fair thing to do." (Tr. 252, 261-62; Adm. Ex. 1).

Respondent testified since learning of Ms. Bird's complaint through the ARDC, he has offered to pay her $2,500.00, but was advised she had demanded $25,000.00. Respondent admitted his offer was made within the two weeks before this disciplinary hearing. He also stated while he is still willing to pay Ms. Bird $2,500.00, he did not believe he owes her anything. (Tr. 261-62, 287, 290-91).

Respondent admitted he did not pay the costs in the Potts matter until 2011. (Tr. 236, 274). He also admitted he has not yet paid anything toward the judgment entered against him in the fee litigation. When asked why, Respondent testified he firmly believes he is following the law with regard to Mr. Hauser because Mr. Hauser had an opportunity to pursue quantum meruit recovery, but instead improperly sought to recover on the contingent fee agreement. Respondent said he was troubled by the fact that Mr. Potts now has a judgment against him, so he has reached out to Mr. Hauser several times to try to resolve the matter, but has been repeatedly rebuffed. It is Respondent's understanding Mr. Hauser has no intention of settling the matter for

less than the amount he was awarded plus post-judgment interest. (Tr. 236, 242, 274, 277-78, 298-99).

Respondent testified both Mr. Hauser and Mr. Potts have valid and enforceable judgments, but he also testified it is common practice for parties to negotiate even after judgments are obtained. Respondent stated he is willing to pay the entire amount, but he did not currently have the funds and would like to work out an agreement to pay it over time. (Tr. 278, 301-305).

Respondent admitted he asked Mr. Potts for $5,000.00 to represent him in the suit filed by Mr. Hauser. Respondent explained he asked for these additional fees because his prior representation had already concluded and he viewed defending this lawsuit as a new client matter. Respondent understood at the time Mr. Potts was being sued by Mr. Hauser based on the fee dispute. Respondent stated if he had it to do all over again, he would have represented Mr. Potts in the suit by Mr. Hauser on a pro bono basis. (Tr. 293-94, 303).

Respondent testified he has done quite a bit of pro bono work during his career. After starting his own practice, he had people approach him for help with criminal matters who could not afford to pay him. He has also helped people with small civil cases when it did not make sense to hire an attorney. Respondent estimated he handled between 5 to 20 criminal cases and a similar number of civil cases on a pro bono basis. Respondent has also been assigned to handle a couple of prisoners' rights cases in federal court on a pro bono basis. (Tr. 278-80).

Respondent is a member of several bar associations and has been involved in the Greek Orthodox Church throughout his life. He was also active for six years in the Evanston YMCA's Indian Princesses, a program for young girls and their fathers. He was the head of that program

for several years and was responsible for organizing weekend campouts and other activities. (Tr. 280-82).

Respondent testified he takes these disciplinary proceedings seriously and has fully cooperated with the ARDC. He testified he respects the legal profession and understands lawyers need to be held to a high degree of accountability. He stated he is remorseful and feels awful about what has happened. (Tr. 282-83).

Prior Discipline

The parties stipulated at the hearing Respondent has no prior discipline.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In attorney disciplinary matters, the Administrator must establish charges of misconduct by clear and convincing evidence. Supreme Court Rule 753(c)(6); In re Ingersoll, 186 Ill. 2d 163, 168, 710 N.E.2d 390 (1999). Clear and convincing evidence constitutes a high level of certainty, which is greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. People v. Williams, 143 Ill. 2d 477, 484-85, 577 N.E.2d 762 (1991). Evidence of suspicious circumstances or the exercise of poor judgment by an attorney, standing alone, are not sufficient to support a charge of misconduct. In re Winthrop, 219 Ill. 2d 526, 550, 555, 848 N.E.2d 961 (2006).

Count I

The charges in Count I stem from the contingent fee Respondent collected in the Kimberly Bird personal injury matter. The evidence showed Ms. Bird, with the help of Mr. Miller, initially attempted to negotiate a resolution of her claim with the insurance company. She received several written settlement offers as a result of these efforts, including one for $20,123.00. After taking over the case and handling it for a little over a year, Respondent

obtained a settlement offer of $27,000.00, which Ms. Bird agreed to accept. He also negotiated a $2,000.00 reduction in the outstanding medical lien. When Respondent distributed the settlement proceeds, he initially sought to collect a fee of $10,800.00, which was 40% of the total settlement amount. After Ms. Bird questioned that fee, he agreed to reduce it to $10,000.00. As a result, Ms. Bird ended up receiving less than if she had taken the original settlement offer and not retained Respondent. There was no written agreement concerning fees and the parties disagreed sharply over what, if anything, was discussed concerning that matter. Respondent was charged with the following misconduct: a.) overreaching; b.) exercising undue influence; c.) charging and collecting an unreasonable fee in violation of Rule 1.5; and d.) failing to put a contingent fee agreement into writing in violation of Rule 1.5(c).[1] We find these charges were proven by clear and convincing evidence.

Respondent clearly violated Rule 1.5(c) by failing to obtain a written contingent fee agreement with Ms. Bird at the outset of his representation. Rule 1.5(c) requires a contingent fee agreement be in writing and state "the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated." The Court has made it clear that this is a mandatory requirement without any exceptions. In re Spak, 188 Ill. 2d 53, 67, 719 N.E.2d 747 (1999). The Court has also held the fee agreement must be memorialized at the outset of the attorney-client relationship and the failure to do so cannot be later cured by obtaining written confirmation from the client. Spak, 188 Ill. 2d at 67. Moreover, the Court has expressed its disapproval of the practice employed by Respondent, of obtaining the client's acquiescence to the fee after the case is essentially over and the attorney is in possession of the

proceeds of the litigation. Id. It is undisputed in this case Respondent did not obtain a signed

contingent fee agreement with Ms. Bird at the time he was retained and had her agree to the fee

after the case settled. This is a clear violation of Rule 1.5(c). Furthermore, although Respondent

did not admit this charge in his Answer, he testified at the hearing he had failed to comply with

this requirement and had violated the rule.

We also find Respondent violated Rule 1.5(a) by charging and collecting an unreasonable

fee. Rule 1.5(a) requires a lawyer's fee be "reasonable." The Rule sets forth the following

factors to be considered in making this determination:

(1)   the time and labor required, the novelty and difficulty of the questions
      involved, and the skill requisite to perform the legal service properly;

(2)   the likelihood, if apparent to the client, that the acceptance of the particular
      employment will preclude other employment by the lawyer;

(3)   the fee customarily charged in the locality for similar legal services;

(4)   the amount involved and the results obtained;

(5)   the time limitations imposed by the client or by the circumstances;

(6)   the nature and length of the professional relationship with the client;

(7)   the experience, reputation, and ability of the lawyer or lawyers performing
      the services; and

(8)   whether the fee is fixed or contingent.

Assessing the reasonableness of a fee under this rule clearly involves a factual determination that

takes into account the specific facts and circumstances of each particular case. See In re

Teichner, 104 Ill. 2d 150, 161-63, 470 N.E.2d 972 (1984).

In order to determine the reasonableness of the fee herein, we initially find it necessary to

resolve certain factual disputes concerning the posture of Ms. Bird's case when Respondent

initially took it over. As noted, the record established Ms. Bird received several written

settlement offers from the insurer without any assistance from Respondent. The first of these

offers was for $19,091.00 and appears to have been faxed to Ms. Bird on May 14, 2007. The second offer was for $20,123.00 and is memorialized in a letter to Ms. Bird dated June 8, 2007. Although it appears from the record Respondent first became involved in the case shortly before the second written offer was received, there is nothing to suggest he had any role in obtaining either offer. This is supported by Respondent's own file, which shows he first wrote the adjuster to notify him he had been retained in the matter on June 21, 2007, which was after both written settlement offers had been made.

Although Respondent denied it, we also find he knew Ms. Bird had already received a settlement offer of approximately $20,000.00 when he took over the case. Both Ms. Bird and Mr. Miller testified Respondent agreed to handle the case after they discussed the matter during a White Sox game, which they attended together. Although no one could remember the exact date of the game, both Ms. Bird and Mr. Miller gave similar accounts of the discussion that led to Respondent being hired. Ms. Bird testified when they told Respondent about the accident, her injuries and what the insurance company had offered, Respondent represented he could get her more money and could probably double the offer. Mr. Miller testified he specifically recalled teasing Respondent about how easy this "attorney stuff" was before telling him he had been able to obtain a $20,000.00 settlement offer for Ms. Bird. Like Ms. Bird, he also recalled Respondent telling them he could get Ms. Bird "a lot more money." We found Mr. Miller's testimony regarding this matter credible. While Ms. Bird clearly had an interest in the case, Mr. Miller did not. In addition, Mr. Miller apparently later had a falling out with Ms. Bird, but remains friends with Respondent. Thus, he would have absolutely no motive to fabricate what occurred, especially since his testimony was unfavorable to Respondent.

In contrast, we do not accept Respondent's testimony concerning the circumstances surrounding his hiring. Respondent claimed he was hired well before the White Sox game and knew nothing about either settlement offer. His testimony is not only contrary to that of the other two witnesses, but it is inconsistent with some of the materials in his own file. The earliest item that appears in Respondent's file is the 11 page fax sent to him by Ms. Bird on May 30, 2007. There is nothing in his file to support his testimony he was retained 30 to 45 days prior to receiving this fax. Moreover, although Respondent insisted he knew nothing about either offer, his testimony is directly contradicted by the fact a copy of the $19,091.00 offer is contained in his own file among the 11 pages of materials faxed to him by Ms. Bird. This inconsistency seriously undermines Respondent's credibility regarding this entire matter.

We also find Respondent's testimony that he was unaware of the settlement posture of the case when he took it on is inherently incredible and improbable. Respondent, by his own description, is an experienced personal injury attorney, who has handled hundreds of cases. It is simply not believable he would take on a case, knowing negotiations had already taken place and various settlement figures had been discussed, without determining the details of those matters. Nor does it make sense he would not have learned of the offers, either from his own client or from the insurance company.

We now examine the reasonableness of Respondent's fee in light of our finding that Respondent was aware Ms. Bird already had a settlement offer of approximately $20,000.00 when he became involved in the case. Based on the various factors set forth in Rule 1.5, as well as the other facts and circumstances of this case, we find Respondent's fee of $10,000.00, or nearly 40% of the total settlement amount, was not reasonable.

Respondent's $10,000.00 fee cannot be supported based upon either the amount involved or the results obtained. As Ms. Bird already had an existing settlement offer of $20,123.00, Respondent was essentially hired to get her more money. Thus, the amount involved in the case was the amount by which Respondent could increase that offer. The evidence showed Respondent increased the offer to $27,000.00 and negotiated a $2,000.00 reduction in the medical lien. Thus, he effectively obtained an additional $8,877.00 for Ms. Bird. By then taking almost 40% of the total settlement amount as his fee, Respondent took that entire increase for himself as well as an additional $1,123.00. Further, the evidence established Ms. Bird would have received $15,123.00 if she had accepted the insurer's original offer, but ended up receiving only $14,000.00 after hiring Respondent. Thus, Ms. Bird not only failed to benefit from Respondent's representation, she actually ended up doing worse than if she had never retained him. Based upon these facts, we find that collecting a $10,000.00 fee for what amounted to a recovery of $8,877.00 was not reasonable.

Moreover, we do not believe Respondent's fee can be justified based upon the time and labor required, the novelty and difficulty of the question involved or the skill required to perform the legal service properly. There is nothing in the record to indicate the case was complex or required any unusual or unique set of skills. On the contrary, the record shows this was a fairly routine personal injury claim stemming from a rear-end automobile accident. Respondent himself even characterized the matter as a "simple broken arm case." There is nothing in the record to indicate the case was particularly time consuming or involved. It is undisputed the claim was settled with the insurance company prior to any litigation being prepared or filed. Moreover, while Respondent had the case for over a year, it does not appear he did an extensive amount of work during this time. His file suggests his work primarily consisted of participating

in some telephone negotiations with the adjuster and submitting some brief correspondence. We note the majority of the correspondence in his file was initiated by other parties, including the adjuster for the insurance company and the claims representative for medical lien holder. Thus, we find nothing about the case itself or Respondent's actual work on the matter supports a $10,000.00 fee.

Additionally, none of the other Rule 1.5(a) factors support the reasonableness of Respondent's fee. Respondent was clearly not required to forgo any other work and there were no time limitations imposed in the matter that might justify a higher fee. Moreover, while Respondent appears to be an experienced personal injury lawyer, there is nothing about his experience, reputation or ability that warrants the fee he collected in this matter.

While we recognize that contingent fees are customarily charged in personal injury matters based on the recovery obtained, this does not alter our conclusion. The Court has made it clear that contingent fees, like all fees, are subject to the reasonableness requirement. Teichner, 104 Ill. 2d at 160-61. Thus, the Court in Teichner found a $7,000.00 contingent fee collected for representing a client on an insurance death benefit claim was excessive and unconscionable where the claim was not contested by the company and was promptly paid in full. Furthermore, it is important to note there was no written contingent fee agreement in this case and it was unclear, based on the evidence, whether the parties ever discussed Respondent's fee or came to any agreement regarding the matter. For Respondent to charge a contingent fee of this size under these circumstances was inappropriate and unreasonable.

We also find Respondent engaged in overreaching. An attorney commits overreaching when he takes undue advantage of the position of influence he holds vis-à-vis a client. In re Rinella, 175 Ill. 2d 504, 516, 677 N.E.2d 909 (1997). Overreaching has been found where such

conduct occurs in connection with the attorney's collection of his own fees or costs. See In re Crane, 96 Ill. 2d 40, 449 N.E.2d 94 (1983);  (Review Bd. at 8) (sanction modified by Court). The evidence establishes Respondent overreached here by taking advantage of his position in relationship to Ms. Bird when he collected his fee from the settlement proceeds.

It is apparent from the evidence Respondent knew at the time the case settled that he did not have a written contingent fee agreement in place.  Respondent admitted he sent Ms. Bird a fee agreement to execute shortly before the settlement was finalized, which she refused to sign. Despite this, Respondent listed his fee on the settlement statement as "40% per contingency agreement" and attempted to deduct $10,800.00 from the settlement proceeds.  When Ms. Bird questioned this amount, he agreed to reduce it only slightly.  According to Ms. Bird, he also used what she described as "legal verbiage" in attempting to explain it to her.  Respondent did not advise Ms. Bird to seek independent advice or counsel regarding the matter nor is there any indication he told her about his failure to fulfill his obligation under the Rules to obtain a written contingent fee agreement.  Furthermore, there is no evidence he gave her any other option, other than signing the settlement statement and agreeing to the fee, in order to receive her portion of the settlement funds.

Respondent attempted to explain his actions by stating Ms. Bird seemed satisfied when she signed the settlement statement and he had "no clue" she had any problem with his fee until she filed her ARDC complaint.  We did not find this testimony credible.  Respondent admitted Ms. Bird expressed concern regarding the amount she would be receiving and asked him if he could "take some off."  He also admitted he agreed to reduce his fee by $800.00 in order to make her "happy."  The evidence clearly shows Respondent knew Ms. Bird had a problem with his

fee. Moreover, contrary to his testimony at the hearing, Respondent admitted in his Answer to the Complaint Ms. Bird did not want to pay his fee.

As the Court noted in Spak, 188 Ill. 2d at 67, there is clearly an inequality in bargaining power and a potential for abuse in a situation such as this, where the attorney waits until the case is over and he is in possession of the funds to memorialize a fee agreement. The Court observed "[a] client in such a situation may be left with the unenviable choice of agreeing with the attorney's recollection of the fee agreement, or delaying receipt of his money pending resolution of a fee dispute." Id. That is essentially what occurred here. We find Respondent engaged in overreaching by using his superior bargaining power and position to, in effect, impose his fee on Ms. Bird.

We also find Respondent exercised undue influence over Ms. Bird in connection with this same transaction. Undue influence is presumed when an attorney, during the course of an attorney-client relationship, enters into a transaction with a client from which the attorney benefits. In re Imming, 131 Ill. 2d 239, 255-56, 545 N.E.2d 715 (1989). This presumption has been deemed applicable where an attorney negotiates a fee agreement or changes the terms of an existing agreement during the course of the attorney-client relationship. See In re Marriage of Pagano, 154 Ill. 2d 174, 185, 607 N.E.2d 1242 (1992); In re Lutz, 06 SH 81, M.R. 22554 (Sept. 17, 2008) (Review Bd. at 9). The Review Board noted in Lutz the key factor in determining whether the presumption applies is not whether there was a fee agreement already in place, but whether the attorney-client relationship existed at the time of the questioned transaction. That was clearly the situation herein, as the transaction occurred at the end of the case in connection with the distribution of the settlement. Accordingly, we conclude the presumption of undue influence applies.

This presumption is a rebuttable one where the burden shifts to the respondent to prove

by clear and convincing evidence the transaction was "fair, equitable and just, and that it did not

proceed from undue influence." Imming, 131 Ill. 2d at 256. Factors that have been identified in

making this determination include the following: 1) whether the attorney made full and frank

disclosure of all relevant information; 2) whether the consideration was adequate; and 3) whether

the client had independent advice before completing the transaction. In re Schuyler, 91 Ill. 2d 6,

16-17, 434 N.E.2d 1137 (1982).

We find Respondent failed to rebut the presumption of undue influence in this case.

Respondent presented very little evidence concerning what occurred during his meeting with Ms.

Bird or what he said to her regarding his fee. Instead, he simply maintained he had no idea she

was dissatisfied or had a problem with the fee. As we have already noted, we did not find this

testimony credible. Furthermore, the same factors discussed in connection with the overreaching

charge also indicate the presumption of undue influence has not been rebutted. Ms. Bird was

clearly not fully informed, especially regarding Respondent's violation of his obligation to obtain

a written contingent fee agreement nor was she advised to seek independent counsel.

Furthermore, there appears to have been no additional consideration for the transaction, since the

work was done and the case was essentially over. Although Ms. Bird acknowledged she did not

need the money at the time, we do not believe this fact alone is sufficient to rebut the

presumption in this case.

Count II

The charges in Count II stem from Respondent's representation of Gary Potts in his

personal injury case and his subsequent actions in the related fee litigation. The evidence

showed Respondent took the case over from another attorney, Mr. Hauser, shortly before it was

scheduled to go to trial in Lake County. Mr. Hauser had already completed a substantial amount of the work on the case and had asserted a lien for his fees. Respondent subsequently had the case dismissed, re-filed it in Cook County and ultimately obtained an arbitration award in favor of Mr. Potts in the amount of $73,717.78. Respondent collected a fee of $29,486.80 from the settlement proceeds and also deducted $882.50 in costs that had been incurred by Mr. Hauser. Respondent did not pay the costs to Mr. Hauser or his former firm and did not give Mr. Hauser any part of the fee he collected. Instead, he filed a motion to seeking to reduce Mr. Hauser's lien to zero, which was granted after Mr. Hauser failed to appear at the hearing.

Although Respondent maintained he sent notice of the motion to Mr. Hauser's former firm, Mr. Hauser never received it. Several years later, Mr. Hauser began to inquire about the status of the case and ultimately discovered what had occurred. He then filed suit against Mr. Potts to recover the value of his services. Mr. Potts, in turn, filed a third-party action against Respondent. Respondent maintained throughout those proceedings Mr. Hauser was not entitled to anything for his work. He also claimed he had paid the costs, which he deducted from the settlement proceeds. After an arbitration hearing, judgments for $16,820.83 were eventually entered against Mr. Potts in the main action and against Respondent on the third-party claim. Although Respondent recently paid Mr. Hauser's costs, both judgments remained outstanding at the time of the disciplinary hearing.

The charges in the Count II are based on allegations Respondent made certain false and misleading statements, both at the time the Potts case settled and in the ensuing litigation initiated by Mr. Hauser that were designed to avoid paying Mr. Hauser for his work in the case. Respondent was charged with the following misconduct: a.) failure to deliver to a client or third person any funds or other property that the client or third person is entitled to receive in violation

of Rule 1.15(b); b.) making a statement of material fact or law to a tribunal which the lawyer knows is false, in violation of Rule 3.3(a)(1); c.) conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Rule 8.4(a)(4); and d.) conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5). We find these charges were proven by clear and convincing evidence.

We find the Administrator proved by clear and convincing evidence Respondent violated Rule 3.3(a)(1) and Rule 8.4(a)(4). The evidence showed Respondent violated Rule 3.3(a)(1) by making certain statements of material fact to a tribunal, which he knew were false. Based on these misrepresentations and certain additional misrepresentations, we also find he engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4). Before addressing the specific misrepresentations at issue, we note initially our findings are based, to a significant extent, on the totality of the circumstances that were established in this case. When all of the facts and circumstances in this case are viewed together they lead to the conclusion Respondent engaged in a deliberate and dishonest course of conduct designed to allow him to keep the entire fee in the Potts case and avoid paying Mr. Hauser for his work.

First, we find Respondent made a statement of material fact he knew was false in his motion to reduce the lien, when he represented to the court Mr. Hauser's representation of Mr. Potts had been "brief." This statement, as well as the motion as a whole, was obviously designed to convey to the court Mr. Hauser had done little in the case and was not entitled to any fee. This clearly was not true and Respondent could not have honestly believed this was an accurate statement. Mr. Hauser represented Mr. Potts for 17 months and the case was on the verge of trial when Respondent took it over. The record shows that Mr. Hauser did a substantial amount of work during this time, including taking multiple depositions and conducting most of the other

discovery in the case. Respondent was undoubtedly aware of the nature and extent of Mr.

Hauser's work. Mr. Hauser made this clear to him at the time he withdrew from the case and

also provided him with a copy of his entire file, which was extensive. Respondent was also

authorized by court order to utilize the prior discovery done by Mr. Hauser and it appears from

the record, he did just that. The fact that Mr. Hauser later documented spending 58 hours on the

case and was awarded over $16,000.00 in fees in the arbitration is further evidence of the extent

of his work. In light of these facts, we are not persuaded by Respondent's claim he regarded Mr.

Hauser's representation as brief, simply because he had the case for a longer period of time.

Rather, we conclude Respondent misrepresented this fact and misled the court.

We also find Respondent misrepresented in the certificate of service he had served a copy

of his motion on Mr. Hauser by mailing it to the Sullivan firm. The evidence clearly established

the motion was never received by Mr. Hauser or the Sullivan firm. Mr. Vasilius, who handled

the incoming mail for the firm, testified very convincingly the motion was not received. Mr.

Hauser also denied receiving it and this is supported by the fact he did not appear at the hearing.

Although Respondent insisted it was sent and suggested it may have been lost in the mail, we do

not find this explanation plausible in light of all of the other circumstances in this case. We note

neither Mr. Hauser nor his former firm received a copy of the order that was subsequently

entered by the court granting Respondent's motion. While defective mail service might arguably

explain the failure to receive one item, we believe it highly improbable both of these items would

have been similarly lost.

There are also other factors herein that point to dishonesty rather than innocent mistake.

In light of its purpose and misleading nature, Respondent clearly had a reason for not wanting

Mr. Hauser to see the contents of the motion or appear at the hearing. We note Respondent also

failed to pay Mr. Hauser the costs he deducted from the settlement proceeds and listed on the settlement statement. This would obviously have alerted Mr. Hauser to the fact the case had been resolved and likely prompted him to pursue his claim for fees. Respondent also failed to send Mr. Hauser copies of the notice or the motion when Mr. Hauser specifically requested them several times a few years later. Based on the evidence as a whole, including our assessment of Respondent's demeanor and overall credibility, we conclude Respondent's statement in the certificate of service that he mailed these materials was false and the notice and motion were never sent.

We also find Respondent made various false and misleading statements during the subsequent fee litigation when he repeatedly asserted he had paid the costs reflected on the settlement statement. The evidence clearly established the costs were never paid. Both Mr. Hauser and his former firm denied receiving payment and Respondent was never able to provide any documentation to support his claim. Nonetheless, the evidence showed Respondent continued to insist throughout that litigation the costs had been paid. The evidence also indicated Respondent not only made these false statements in response to inquiries by Mr. Hayes, he also testified similarly at his deposition and at the arbitration hearing regarding this matter.

Respondent denied he ever stated during the litigation he had definitely paid the costs. He contends he only stated his belief the costs were paid because this was his usual practice. However, the evidence indicates otherwise. Mr. Hayes testified Respondent told him not only he paid the costs, but he "remembered" paying them. Mr. Hayes' testimony is corroborated by two e-mails he received from Respondent that were introduced into evidence. In one, Respondent stated, "I remember paying it." In the other, he stated, "I remember sending out a check." Mr.

Hayes also testified Respondent gave similar testimony at his deposition and at the arbitration hearing.

Moreover, regardless of the particular language Respondent used, we find he engaged in knowing misrepresentation by continuing to assert his "belief" throughout the litigation the costs had been paid. The evidence shows Respondent continued to take this position up to and through his testimony at the arbitration hearing, despite the lack of any proof and in the face of evidence to the contrary. Everyone involved in the matter stated unequivocally the costs were never received. Respondent had no record of any payment and his own bank could not find records to support his claim. Clearly, by the time he gave his deposition and testified at the arbitration hearing, Respondent had to know the costs had not been paid. Under these circumstances, for him to continue to assert even his belief they were paid, constituted a knowing misrepresentation. See e.g. In re Masters, 98 CH 60, M.R. 17674 (Mar. 8, 2002) (discipline modified by Court) (knowing misrepresentation found where attorney continues to assert matters despite overwhelming evidence to the contrary).

We next find Respondent violated Rule 1.15(b). Rule 1.15(b) provides "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person." It further requires the lawyer, subject to certain exceptions, to "promptly deliver to the client or third person any funds that the client or third person is entitled to receive." Respondent clearly violated this rule here by failing to promptly tender the $882.50 in costs from the settlement proceeds to Mr. Hauser or his former firm. It was undisputed he took the funds from the settlement in 2005, but did not pay them until 2011, after these disciplinary proceedings were instituted. In addition, we also find Respondent violated this Rule by failing to pay Mr. Hauser any portion of these funds for his work in the case. The evidence

established Respondent was aware of Mr. Hauser's lien and knew he had an interest in the fees recovered. When he received the first settlement check that named Mr. Hauser as a payee, Respondent did not notify Mr. Hauser of his receipt of these funds nor did he inform him the case had settled or request him to call to try to work out a resolution of his fee claim, as he had promised Mr. Potts. Instead, he obtained a court order extinguishing the lien and kept the entire fee for himself. As a result, Mr. Hauser has not been paid to this day for the work he did in this matter. We find these actions constituted a violation of Rule 1.15(b).

Finally, we also find Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5). Respondent's actions clearly harmed the administration of justice. He obtained a court order in the Potts matter based on a false and misleading statement and without providing proper notice to Mr. Hauser. His actions directly led to the protracted litigation subsequently instituted by Mr. Hauser against Mr. Potts. Respondent then wasted additional time and resources during those proceedings by refusing to admit he had failed to pay the costs.

<u>RECOMMENDATION</u>

Having found Respondent engaged in misconduct, we must determine appropriate discipline. In making this recommendation, we take into account the goal of the disciplinary process is not to punish the Respondent, but to safeguard the public, maintain the integrity of the profession, and protect the administration of justice. <u>In re Timpone</u>, 157 Ill. 2d 178, 623 N.E.2d 300 (1993). We also consider the nature of the misconduct, the aggravating and mitigating factors, the deterrent value of the sanction, and whether the sanction will help preserve public confidence in the legal profession. <u>In re Gorecki</u>, 208 Ill. 2d 350, 360-61, 802 N.E.2d 1194 (2003). Although each case is unique and must be resolved in light of its own facts and

circumstances, predictability and fairness require we recommend sanctions that are consistent with those imposed in cases involving comparable misconduct. In re Howard, 188 Ill. 2d 423, 440, 721 N.E.2d 1126 (1999).

Respondent's misconduct in this matter is very serious. After failing to comply with his obligation to obtain a written contingent fee agreement in the Bird matter, he charged a 40 percent contingent fee anyway. This fee was clearly excessive and unreasonable under the circumstances and Respondent overreached and exercised undue influence in collecting it from his client. Respondent also engaged in a deliberate and dishonest course of conduct in the Potts matter that was calculated to avoid paying Mr. Hauser for his work in the case. His actions included making false and misleading statements, including material misrepresentations in several pleadings. Honesty and candor, especially before a court or other tribunal, is a fundamental obligation of every attorney. See In re Yamaguchi, 118 Ill. 2d 417, 426, 515 N.E.2d 1235 (1987). The Supreme Court has indicated that an attorney's intentional filing of a false or misleading document with a court is a "fraud practiced upon the judicial system" and is "professionally outrageous." In re Thebeau, 111 Ill. 2d 251, 256, 489 N.E.2d 877 (1986).

There are also a number of aggravating factors in this case. Most notable is the substantial harm Respondent's clients suffered as a result of his misconduct. See In re Saladino, 71 Ill. 2d 263, 276, 375 N.E.2d 102 (1978). Ms. Bird was obviously harmed financially when she was charged an unreasonable fee. Mr. Potts suffered even greater harm because he was sued by Mr. Hauser as a direct result of Respondent's actions. He was required to retain an attorney to defend him and pursue a third-party action against Respondent. He has been forced to endure time consuming litigation, which ultimately resulted in a $16,820.83 judgment against him. As of the date of the hearing, that judgment, which now exceeds $20,000.00, remained unsatisfied.

It was obvious from Mr. Potts' testimony this entire experience, quite understandably, has been difficult and stressful for him. In addition to the harm to Respondent's clients, we also note Mr. Hauser had to file litigation to try to collect his fees and has not yet been paid for his work.

Respondent's original misconduct in the Potts matter is also significantly aggravated by the actions he took once the fee dispute came to light. When Mr. Potts contacted him for help after being sued by Mr. Hauser, Respondent responded by asking for $5,000.00 to represent him in the matter. Respondent sought these additional fees despite the fact that he had repeatedly assured Mr. Potts he would resolve the fee issue with Mr. Hauser, so that Mr. Potts would not have to pay two attorneys. Under these circumstances, Respondent's attempt to use this as an opportunity to collect additional fees from Mr. Potts is appalling. When Respondent was later contacted by Mr. Hayes and urged to work something out with Mr. Hauser, he absolutely refused to do so. Instead, he became angry and hostile, and threatened Mr. Hayes with sanctions. There is no indication Respondent ever exhibited any concern for Mr. Potts, who was now facing a separate lawsuit, as a direct result of Respondent's actions. Respondent's apparent willingness to simply abandon his former client and leave him to fend for himself in this matter is extremely disturbing.

Respondent's misconduct is further aggravated by his failure to pay restitution in either matter. See In re Fox, 122 Ill. 2d 402, 410, 522 N.E.2d 1229 (1988). Respondent has not refunded any of his fee to Ms. Bird and did not offer to do so until shortly before the disciplinary hearing. Even if we were to conclude his $2,500.00 offer was adequate, such a belated effort at restitution carries little weight. More troubling is Respondent's failure to make any meaningful effort to satisfy the judgment that was entered against him in the litigation with Mr. Hauser and Mr. Potts. Although Respondent recently paid the $882.50 in costs, he admitted he has not paid

48

anything towards the judgment, which was entered on January 15, 2009. As a result, the judgment against Mr. Potts also remains outstanding. Respondent pointed out he recently made offers of $5,000.00 and 7,500.00, which Mr. Hauser refused to accept. Both these offers were made after these disciplinary proceedings were instituted and are well below the judgment amount. Furthermore, while Respondent seems to fault Mr. Hauser for not agreeing to compromise his claim, we do not agree. Mr. Hauser and Mr. Potts have reduced their claims to judgments and are not required to accept a lesser sum. In light of Respondent's steadfast refusal to attempt to resolve the matter either before or during the litigation, it is understandable that Mr. Hauser was not inclined to negotiate with him now.

We also note in aggravation Respondent's failure to recognize his wrongdoing and accept responsibility for his actions. In re Samuels, 126 Ill. 2d 509, 531, 535 N.E.2d 808 (1989). Aside from acknowledging his error in failing to obtain a written contingent fee agreement, it was evident from Respondent's testimony and overall demeanor, he does not believe he has done anything wrong. In addition, Respondent's misconduct is further aggravated by his apparent lack of candor in his testimony before this Board. See Gorecki, 208 Ill. 2d at 366.

In mitigation, we note Respondent has not been previously disciplined during his legal career of nearly 30 years. Respondent testified he has done some pro bono work, is active in his church, and had a leadership role in a father-daughter program at the YMCA. Several witnesses also testified as to Respondent's good character, but most were not familiar with the charges in this case.

With regard to sanction, the Administrator argues Respondent's misconduct, the aggravating factors and the lack of substantial mitigation, warrants a suspension for one year. The Administrator also suggested Respondent be required to make restitution to Ms. Bird and

Mr. Potts. Respondent argued he should only be reprimanded for his failure to obtain a written contingent fee agreement and required to satisfy the judgment in the Hauser/Potts litigation.

We reject at the outset Respondent's suggestion he deserves only a reprimand for his misconduct. A reprimand is clearly inadequate discipline in light of our findings of serious misconduct and the significant aggravating factors.

With respect to the misconduct in Count I, the Administrator relies on several cases where attorneys have been suspended for varying lengths of time for misconduct involving the collection of improper fees. In In re Kleczek, 05 SH 24, M.R. 21745 (Sept. 18, 2007), the respondent was suspended for 60 days for collecting an unreasonable fee and misleading his client in connection with the settlement of a workers' compensation matter. The attorney there collected additional fees from his client after his fees had been substantially reduced by the arbitrator, who approved the settlement. There was significant mitigation in that case, including a lengthy career without any prior misconduct, impressive evidence of good character and evidence of pro bono work and other community involvement.

In In re Johnson, 01 SH 53, M.R. 18594 (Mar. 19, 2003), the respondent was disciplined for charging an unreasonable fee and other misconduct after he charged more than $15,000.00 for handling a routine probate matter of an estate worth $37,000.00. He also aggravated the original misconduct by failing to inform his client she could challenge the fee and by misrepresenting to the court the fee had been approved by all parties. The respondent was suspended for three months and until he paid $9,794.50 in restitution.

In In re Salerno, 93 CH 188, M.R. 10433 (Nov. 30, 1994), the respondent charged a beneficiary a 20 percent contingent fee to collect the proceeds of two $100,000.00 insurance policies. Although it was originally anticipated there might be obstacles to collection, the claims

were uncontested and the company paid the face amounts. The respondent's total fees of $41,000.00 were found to be excessive. The respondent also improperly attempted to limit his liability to the client by having her sign releases in connection with the disbursement of the funds. Aggravating factors included the respondent's failure to reduce the contingent fee agreement to writing and the delay in refunding the unearned fees. The respondent was suspended for five months.

As to the misconduct in Count II, the Administrator also relies on several cases where attorneys have received suspensions of varying lengths for misrepresentations to courts and others. In In re Heyl, 96 CH 690, M.R. 12944 (Nov. 26, 1996), the respondent was involved in an automobile accident with an uninsured motorist and agreed to misrepresent the date of the accident in order to allow the uninsured driver to obtain insurance. She then misrepresented the date of the accident in a police report and testified falsely under oath regarding the matter at a subsequent arbitration hearing. The respondent was suspended for three months.

In In re Passman, 93 CH 573, M.R. 12249 (Mar. 26, 1996), the respondent was disciplined for preparing a false stipulation to dismiss a wage deduction proceeding that was pending against his wife. He also forged the signature of the opposing attorney to it and submitted it to his wife's employer. He then engaged in a lengthy cover-up of his original misdeeds by lying to the court, opposing counsel and the ARDC about his actions. The respondent was suspended for nine months and until he made restitution to the bank's attorney for fees incurred in the matter.

In In re Kavvadias, 08 CH 70, M.R. 23079 (May 18, 2009), the respondent fabricated a court order in a driver's license reinstatement matter and made multiple misrepresentations to his client over a period of several years regarding the case. In a separate contract case, he

misrepresented to the court on six occasions that opposing counsel had agreed to continue the matter and presented six orders that were falsely marked as "agreed." In aggravation, he had been previously censured for neglecting a criminal matter and failing to cooperate with an ARDC investigation. The respondent was suspended for one year.

Based on our review of precedent and taking into account the specific findings of misconduct and the aggravation and mitigation in this case, we conclude a suspension for a period of one year is appropriate discipline.[2] As the cases cited by the Administrator indicate, the misconduct in Count I alone warrants a suspension in the range of 30 days to five months. The misconduct in Count II, which was more serious, warrants a suspension ranging from three months to as much as one year. Overall, we conclude a suspension for a total period of one year properly takes into account the seriousness of Respondent's misconduct in both matters, as well as the various aggravating and mitigating factors.

In addition, we agree with the Administrator that Respondent's suspension should continue until he makes restitution to Ms. Bird and until the judgment against him in the fee litigation with Mr. Potts and Mr. Hauser has been satisfied in some manner. With regard to the Bird matter, we note our reluctance to attempt to determine an appropriate fee in the case in order to calculate restitution. This is especially true since it is unclear from the record whether the parties ever discussed fees, let alone came to any agreement concerning what Respondent was to be paid. Nonetheless, Respondent has put us in this position by failing to obtain a written contingency fee agreement as required by the Rules. Based on the record, we believe a reasonable fee in the case should be based on the amount by which Respondent increased the settlement offer during the time he represented Ms. Bird. As we have already found, that amount

is $8,877.00. A 40% contingency fee based on that amount results in a total fee of $3,551.00. Since Respondent collected $10,000.00, we conclude he should repay $6,449.00 to Ms. Bird.

With respect to the fee litigation with Mr. Potts and Mr. Hauser, we also note our reluctance to interfere with ongoing civil proceedings. The ARDC is not a collection agency and it is not our role to become involved in securing the payment of debts owed by attorneys. See In re Smith, 168 Ill. 2d 269, 295, 659 N.E.2d 896 (1995); In re McAuliffe, 116 Ill. 2d 254, 262-63, 506 N.E.2d 1300 (1987). However, in this case we have serious concerns Mr. Potts has been left facing this substantial judgment as a result of Respondent's actions and Respondent has made no real effort to satisfy the judgment entered against him. Thus, we recommend Respondent's suspension should continue until Mr. Potts' judgment against Respondent has been satisfied, whether through settlement or payment of the judgment in full. We will not dictate the terms upon which the matter should be settled or otherwise resolved, but leave this to the parties to determine.

For the foregoing reasons, we recommend that Respondent, John L. Malevitis, be suspended for a period of one (1) year, and until he pays restitution to Kimberly Bird in the amount of $6,449.00 and provides the Administrator with satisfactory proof the judgment entered against him in the litigation with Gary Potts and Robert Hauser has been satisfied.

Date Entered: _April 12, 2012_

_Terrence M. Burns_ KT
Terrence M. Burns, Chair, Rebecca J. McDade, and William E. Gabbard, Hearing Panel Members.

MAINLIB_#410634_v1

[1] The Administrator also charged Respondent in Counts I and II with engaging in "conduct which tends to defeat the administration of justice or bring the courts or legal profession into disrepute in violation of Supreme Court Rule 770." The Illinois Supreme Court recently stated, "Rule 770 is not itself a Rule of Professional Conduct" and "one does not 'violate' Rule 770. Rather, one becomes subject to discipline pursuant to Rule 770 upon proof of certain misconduct." In re Thomas, 2012 IL 113035, ¶ 92. Accordingly, based on the wording of the allegations in the Complaint before us, we find no violations of Rule 770.

[2] The fact we did not find violations of Supreme Court Rule 770 does not affect our recommendation as to sanction. In re Gerard, 132 Ill. 2d 507 (1989).